## Berger v. Mimms

*Howard Gittis*, for plaintiffs.
*Oscar N. Gaskins*, for defendants.

JAMIESON, P. J., March 25, 1968.—This action in equity arises out of a rent strike at Jefferson Manor, a complex of houses and apartments owned and operated by plaintiffs. The strike was organized and participated in by numerous tenants of Jefferson Manor in conjunction with the individual defendants, William Mimms and William Mathis. The withheld rent was paid into an escrow fund which is presently being held subject to the order of this court. After considerable litigation, the parties have narrowed their differences to the sole question of whether plaintiffs or the tenants are entitled to the fund accumulated during the now terminated strike. For the reasons herein-

after stated, we find for plaintiffs and direct that the fund be paid to them.

## FINDINGS OF FACT

1. Plaintiffs are the owners of Jefferson Manor, a complex of 109 houses and 120 apartments leased for residential occupancy.

2. The tenants of Jefferson Manor occupy their respective premises pursuant to the terms of leases approved by the Commonwealth of Pennsylvania in the form attached to plaintiffs' complaint as exhibit "D".

3. Defendant William Mimms is not a tenant of Jefferson Manor; his interest in the strike arose out of his membership in the National Fair Housing Association, of which he appears to be the president and only member.

4. Defendant William Mathis is an individual, not a tenant of Jefferson Manor.

5. Defendants Dorsey Acklin and John Marshall are tenants of Jefferson Manor and are officers of the Jefferson Manor Civic Association, an unincorporated association composed of some of the tenants of Jefferson Manor.

6. All of defendants organized, induced and encouraged a "rent strike" at Jefferson Manor in which a substantial number of tenants participated. Participating tenants paid their rent into an escrow fund rather than to plaintiffs.

7. This equity action was commenced by the filing of a complaint in equity on July 25, 1967, charging defendants with tortious interference with plaintiffs' contracts with their tenants by inducing and causing tenants to withhold rental payments from plaintiffs and to pay the money into escrow.

8. Injunctive relief was requested to restrain defendants preliminarily, and after final hearing, perm-

anently, from inducing tenants of Jefferson Manor to pay rent money into escrow in lieu of making the payments to plaintiffs.

9. On July 25, 1967, a rule was granted on defendants returnable August 2, 1967, to show cause why the preliminary injunction prayed for should not be granted.

10. Hearings were held on August 2nd and 3rd before Honorable Charles A. Waters, at the conclusion of which the rule was discharged without prejudice to a subsequent application by plaintiffs.

11. Subsequently, plaintiffs renewed their application for injunctive relief and on August 31, 1967, this court entered an order allowing a special injunction pending final hearing. The order, in addition to ordering that further solicitations to withhold payment of rent discontinue, enjoined defendants from withdrawing or dealing in any manner with funds on deposit in the Central-Penn National Bank which represented rental moneys secured from a large number of tenants of Jefferson Manor and deposited in escrow.

12. The order of this court on August 31, 1967, was entered following the repudiation by defendants of an agreement made under the supervision of the court by which the funds collected by defendants from tenants of Jefferson Manor would be made subject to the control of counsel for both parties, in order to ensure its safekeeping, pending resolution of the dispute by negotiations or final hearing.

13. Thereafter, the matter was continued until September 7, 1967, at which time the parties entered into a stipulation approved by the court which provided in its essential respects:

(a) that the special injunction of August 31, 1967, be continued;

(b) that the Central-Penn National Bank be directed to remit to plaintiffs the sum of $7,967.50 on

deposit in the "Jefferson Manor Escrow Account" and that the balance of that account, $2,000, be made subject to the further order of the court; and

(c) that plaintiffs continue to correct all violations at Jefferson Manor which had been noted by the Department of Licenses and Inspections of the City of Philadelphia, said repairs to be substantially completed within 60 days.

14. Notwithstanding the stipulation and decree of September 7, 1967, the practice of soliciting, encouraging and inducing tenants of Jefferson Manor to withhold rental payments from plaintiffs and to pay said sums to third persons continued. Hearings were then held to determine if any of the defendants were involved in violation of the court's injunction. No adjudication of this issue was made, however, because the parties have since stipulated that "All contempt proceedings instituted by both plaintiffs and defendants shall be dismissed".

15. Thereafter, the matter came up for final hearing on December 7, 1967. At the conclusion of that hearing, the parties entered into settlement negotiations which culminated in a stipulation dated December 14, 1967, and which was approved by the court.

16. The stipulation provided, inter alia, that:

(a) all rental moneys currently held in escrow be remitted to Oscar Gaskins, Esq., counsel for defendants, to be held subject to the order of the court;[1]

(b) all eviction proceedings against tenants who paid their rent money into escrow be terminated;

(c) plaintiffs proceed to correct all violations noted by the Department of Licenses and Inspections in accordance with the schedule established by that department;

---

[1] The $2,000 then in the custody of Central-Penn National Bank was to remain there, still subject to the order of the court.

(d) defendants enter into a consent judgment permanently enjoining them from, inter alia, soliciting, encouraging or inducing any tenant of Jefferson Manor to withhold payment of rent to plaintiffs or establishing, encouraging or assisting in the establishment of an escrow fund for the payment of rent by tenants of Jefferson Manor in lieu of payments to plaintiffs.

17. Pursuant to the stipulation of December 14, 1967, the sum of $10,261.75 that had been paid into escrow by the tenants of Jefferson Manor was remitted to Oscar Gaskins, Jr., Esq., and is presently in his custody.

18. Pursuant to the stipulation of December 14, 1967, plaintiffs have proceeded to correct all violations noted by the Department of Licenses and Inspections, in accordance with a schedule established by that department. As of February 21, 1968, there remained out of a total of 129 violations only 33 not fully corrected, and of those, 10 were substantially completed and work had commenced on the remaining 23.

19. The fund in the custody of Oscar Gaskins, Esq., and the fund in the custody of Central-Penn National Bank both derive from rental payments made by the tenants of Jefferson Manor for periods of peaceful possession now fully transpired.

20. Paragraph 14(d) of the form lease in effect at Jefferson Manor provides that:

"The Lessor has let the demised premises in their present condition and without any representation on the part of the Lessor. . . . It is understood and agreed that Lessor is under no duty to make repairs or alterations at the time of letting or at any time thereafter".

21. Paragraph 15(a) of the form lease in effect at Jefferson Manor provides that:

"No contract entered into or that may be subsequently entered into by Lessor with Lessees relative to any alterations, additions, improvements or repairs, nor the failure of the Lessor to make such alterations, additions, improvements or repairs as required by any such contract, nor the making by the Lessor or its agents or contractors of such alterations, additions, improvements or repairs, shall in any way affect the payment of the rent or said other charges at the time specified in this lease".

22. None of the dwellings at Jefferson Manor has been certified by the Department of Licenses and Inspections as unfit for human habitation.

23. On December 18, 1967, a rule was granted on defendants returnable February 1, 1968, to show cause why the $2,000 in the custody of Central-Penn National Bank and the $10,261.75 in the custody of Oscar N. Gaskins, Esq., should not be remitted to plaintiffs.

### Conclusions of Law

1. Unless the demised premises have been certified unfit for human habitation, or unless made expressly conditional, the covenant to pay rent in a lease agreement is independent of all other obligations of the landlord except the obligation not to interfere with the tenant's peaceful possession.

2. Under the lease agreements in force at Jefferson Manor, the tenants have no right to remain in possession of their respective dwellings while withholding their rental payments from plaintiffs, and the payments made of these sums into an escrow fund not authorized by plaintiffs does not operate to sanction such possession or cure the default.

3. The funds presently held by Oscar N. Gaskins, Esq., and the Central-Penn National Bank constitute rental payments that should have been made to plaintiffs.

4. The conduct of defendants in organizing, inducing and encouraging a rent strike at Jefferson Manor constituted a tortious interference with the contractual rights of plaintiffs, and was done intentionally and without privilege.

5. Plaintiffs' remedies at law for the tortious conduct of defendants and failure of the tenants to pay rent in accordance with the lease agreements, are inadequate.

6. Plaintiffs are equitably entitled to the fund of $2,000 presently being held by Central-Penn National Bank and the fund of $10,261.75 presently being held by Oscar N. Gaskins, Esq., the full amount representing arrearages in rent from the tenants who have paid into the rent strike fund.

## DISCUSSION

Plaintiffs commenced this action in equity on the theory that defendants tortiously interfered with the lease contracts between plaintiffs and their tenants by inducing numerous tenants to withhold rental payments from plaintiffs, causing them to make payment instead into a rent escrow fund. The defense interposed throughout has been that this "rent strike" does not constitute a breach of contract, being justified by reason of improper maintenance and repair of the premises. In addition, it is averred that plaintiffs have an adequate remedy at law by way of distraint, eviction and action to enter judgment on the lease.[2]

The parties, through a settlement stipulation dated December 14, 1967, have resolved many of their differences. Plaintiffs have agreed to:

1. Terminate eviction proceedings against those tenants who paid their rent into the escrow fund;

2. Dismiss all contempt proceedings against defendants;

---

[2] See paragraphs 16, 17, 18, 19 and 23 of the lease.

3. Give up any claim to compensatory or punitive damages against defendants; and

4. Proceed with the correction of violations noted by the Department of Licenses and Inspections at a rate in accordance with the department's schedule.

In return, defendants have agreed to:

1. Remit all outstanding escrow money into the custody of Oscar N. Gaskins, Esq., to be held subject to the order of the court;

2. Forego contempt proceedings against plaintiffs;

3. Take no action to impede eviction proceedings against tenants who did not pay rent to either plaintiffs or the escrow fund;

4. Entry of consent judgment permanently enjoining defendants from further soliciting and encouraging tenants to withhold rent; and

5. Issue, with plaintiffs, a joint statement that the rent strike is over as of November 30, 1967.

As both parties have substantially complied with the stipulation, the only remaining question is whether the escrow fund should be returned to the tenants or paid to plaintiffs in satisfaction of the rent arrearages.

The escrow fund represents rental payments withheld from plaintiffs in order to force plaintiffs, through concerted economic pressure, to make repairs at Jefferson Manor. However, under the lease agreement, the lessor has no responsibility whatsoever to make repairs.[3] Further, the obligation to pay rent exists independently of other lease obligations, Stern's Trickett on the Law of Landlord and Tenant, p. 119; 21 P. L. Encyc. 502; Restatement, Contracts §290, and independently of subsequent agreements concerning repairs.[4] Even if the landlord were in default on a

---

[3] See paragraph 14(d) of the lease.

[4] See paragraph 15(a) of the lease.

covenant to repair, or subsequent agreement to repair, the tenant would still be obligated to pay rent for periods of peaceful possession. Defendants have failed to show us any legally cognizable reason why the rental monies should have been deflected from the landlord into the escrow fund.[5]

It is obvious that the deflection of rental moneys into the escrow fund was triggered in part by the tortious conduct of defendants. If a tenant is induced by a person not a party to the lease agreement to violate the terms of the agreement, the latter has tortiously interfered with the contract rights of the landlord: Capecci v. Liberty Corporation, 406 Pa. 197 (1962); Birl v. Philadelphia Electric Co., 402 Pa. 297 (1960); Klauder v. Cregar, 327 Pa. 1 (1937). If parties enter into a contract, they have a right to be free from unjustified, albeit well intentioned, outside interference. As we see it, a rent strike is simply mass interference with the many individual lease contracts.[6]

All four defendants actively led the rent strike until the injunction issued by this court on September 7, 1967. After that date, defendants Acklin and Marshall continued to pay their rent money into escrow and defendant Mathis received the funds from the tenants and transferred them to a third party, Thaddeus Mathis. Plaintiffs concede that defendant Mimms was not involved after September 7, 1967.

---

[5] The Act of January 24, 1966, P. L. 1534, as amended, 35 PS §1700, does not indicate a contrary result. That statute provides for the payment of rent into escrow, notwithstanding contrary lease provisions, where the demised premises are certified unfit for human habitation by the Department of Licenses and Inspections. The violations found by the Department of Licenses and Inspections at Jefferson Manor dealt only with problems of routine maintenance. It is clear that no dwelling has been certified as unfit for human habitation. Accordingly, the statute is inapplicable.

[6] Nor do we find that defendants were acting under a "privilege", as that term is defined in the Restatement, Torts, §767.

Practically, the second strike, in violation of the injunction, was a mere continuation of the first. It was motivated by the same dissatisfaction; it was participated in by substantially the same tenants. In sum, defendants, with the exception of Mimms, have controlled the direction of the tenant negotiations and funds throughout. Now, having accomplished an agreement wherein their major goals regarding landlord repairs have been attained, defendants blithely turn the funds over to their counsel and urge that plaintiffs have no claim on them. This is legally and equitably wrong.

Contractually, plaintiffs were and are entitled to receive rent for the periods that rent money has been paid into escrow. Defendants' tortious conduct has deprived plaintiffs of these funds. Equitably, the arrearages should be paid expeditiously and without further protracted litigation from the funds now on hand. Were we dealing with an individual tenant, the contractual provisions of the lease would provide an adequate remedy. The dissatisfied tenant who withholds or places his rental payments into escrow stands the risk of eviction, distraint for rent and summary judgment, all of which are cumulative. We are here dealing, however, with a "rent strike" which involves the added elements of placing the landlord in economic extremis with regard to his mortgage payments, and the cost and administrative difficulties in prosecuting multiple eviction and collection proceedings.

During the course of the strike, plaintiffs did not evict any tenant who paid rent money into escrow. Plaintiffs have substantially completed repairs on violations noted by the Department of Licenses and Inspections, despite the provisions of the lease. Any future delay in collecting outstanding rent will gravely injure plaintiffs in meeting their mortgage obligations, currently in arrears. Accordingly, plaintiffs

have waited long enough to recover the rentals to which they are entitled and should receive them from the fund on hand, all of which constitutes back rent.